UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:20-cr-0057-JDL |
| | ) | |
| RYAN LYNCH, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

Ryan Lynch is charged with distribution of fentanyl, in violation of 21 U.S.C.A. § 841(a)(1) (West 2021). Lynch moves to suppress all of the statements that he made to law enforcement officers on October 30, 2018 (ECF No. 53). A hearing on the motion was held on April 29, 2021. I requested supplemental briefing from the parties regarding whether Lynch was subject to custodial interrogation in violation of the requirements of *Miranda v. Arizona*, 384 U.S. 436 (1966). This request led to a dispute between the parties as to certain material facts. (ECF No. 77). An evidentiary hearing was held on August 24, 2021. For the following reasons, I deny the Motion to Suppress.

**I. FACTS**

The parties have stipulated to the following facts:

On October 29, 2018, Kittery Police responded to a dispatch call reporting a male in his thirties not breathing. The individual could not be resuscitated and was pronounced dead at approximately 8:42 p.m. A subsequent autopsy revealed the cause of death to be "[t]he combined effects of fentanyl and acetyl fentanyl." (ECF No. 71 at 2).

1

Law enforcement officers retrieved three cell phones at the scene. On October 30, 2018, Detective Brian Cummer of the Kittery Police Department asked Special Agent Scott Corey, with the Maine Drug Enforcement Agency ("MDEA"), to process the cell phones. SA Corey extracted data from the phones and ultimately identified Ryan Lynch as a person who had texted with the deceased person regarding drug transactions, including on October 29, 2018.

On October 30, 2018, Det. Cummer and SA Corey went to Lynch's residence in Kittery. Lynch's girlfriend, who is also the deceased's sister, answered the door and went into the home to get Lynch. When Lynch came to the door, Det. Cummer identified himself and Lynch said he thought that they were there about the deceased person.[1]

Lynch spoke with the officers outside of the residence and he became emotional. SA Corey asked if they should go talk somewhere else away from Lynch's girlfriend. At SA Corey's suggestion, Lynch voluntarily went with Det. Cummer and SA Corey to their vehicle to continue the recorded conversation. Approximately twenty-two minutes into the interview, SA Corey read Lynch his *Miranda* rights. Lynch acknowledged that he understood his rights and agreed to continue the conversation. At the conclusion of the interview, which lasted approximately two hours, the officers dropped Lynch off.

I now turn to the facts that I find based on the audio recording of the October 30, 2018 interview and the evidentiary hearing held on August 24, 2021. SA Corey,

---

[1] The conversation between SA Corey, Det. Cummer, and Lynch was preserved in an audio recording. The recording begins at the front door of the residence, with the officers asking to speak with Lynch, and concludes when Lynch is dropped off following the interview.

Det. Cummer, Ryan Lynch, and Kelly Niles (Lynch's girlfriend and the deceased person's sister) testified at the hearing. The October 30, 2018 audio recording aligns with the officers' in-court testimony, and I find their testimony to be credible. I therefore rely on their testimony with respect to the disputed facts.

A.   **Interview Prior to *Miranda* Warnings**

When Det. Cummer and SA Corey arrived at Lynch's residence on the afternoon of October 30, 2018, both officers wore plainclothes. They carried weapons but never brandished them. No other officers were present at the scene, and no other police vehicles followed Det. Cummer and SA Corey to provide support. After a few minutes, as the conversation began to center on Lynch's drug use, SA Corey asked Lynch if he would prefer to go somewhere else to talk where there would be more privacy.

The officers told Lynch that they wanted to speak with him to better understand how his girlfriend's brother had acquired drugs on the day of his death. SA Corey asked how much Lynch had sold to him the previous day, and Lynch confirmed that he sold him a gram. Lynch then stated, "I don't want to be tricked," and the officers responded that they were not tricking him and that he wasn't telling them anything that they did not already know. Lynch then asked whether the officers were going to let him stay at the residence or if they were taking him to jail. The officers stated that they would not be taking him to jail but that they wished to obtain additional information.

Lynch then asked the officers, "Can you guys get out of here now and I'll just call you? Before [my parents] come home?" In response, the officers reiterated that

3

it was not a trick and asked if Lynch would come with them "real quick." Lynch agreed while asking them to drop him off down the road. The officers asked him to grab both his phone and his cigarettes, telling him that they would not take the phone but that they "may have to look through it a little." When Lynch went inside, unaccompanied, to retrieve his phone and cigarettes, SA Corey told Det. Cummer that they were in fact going to take the phone, to which Det. Cummer responded, "Yup wasn't going to tell him that."

When Lynch returned, SA Corey asked him to go to the car, and clarified, "[A]gain, we aren't taking you anywhere you said you didn't want to go?" The officers told Lynch he could sit in the front, and then all three entered the car, with Det. Cummer driving, Lynch in the front passenger seat, and SA Corey sitting in the back. Lynch was not put in restraints. The officers confirmed that they could not make any promises about what would happen if there were a prosecution in the future. SA Corey asked Det. Cummer if he minded if they drove to the police station so that SA Corey could grab something from his car and reassured Lynch that they would not go inside.

Lynch confirmed that he had purchased the drugs and then provided them to the deceased person. At one point, Lynch told the officers "I am so upset." Det. Cummer told Lynch that they understood that he was in a difficult position and that they hoped he could grieve and find clarity by helping their investigation.

Det. Cummer had to exit the car and let SA Corey out when they arrived at the police station because the backseat child lock was enabled, and the door could not be opened from the inside. SA Corey returned, and the officers asked Lynch to sign a

consent form to search his phone, at which point Lynch asked if he was "screwed" and going to jail. SA Corey replied that, whether or not he consented to the search, they would take him back to his house that day, not to jail. Det. Cummer reiterated, "Right we are not taking you into custody," and SA Corey followed with, "We are not taking you to jail."

### B. Recitation of *Miranda* Warnings

Approximately twenty-two minutes into the interview, SA Corey read Lynch his *Miranda* rights. Lynch asked if that meant he was being arrested, and SA Corey responded that, no, it did not mean Lynch was being arrested and that instead he was reading Lynch his rights to make sure he was aware of them. After hearing his *Miranda* rights, which Lynch acknowledged understanding, Lynch confirmed that he would answer the officers' questions.

### C. Questioning Following *Miranda* Warnings

Throughout the interview, Lynch repeatedly expressed his sadness and remorse over the death of his girlfriend's brother. SA Corey praised Lynch for his remorse and acknowledged that talking to them was difficult given the circumstances. Lynch also acknowledged that he "thought [he] was going to jail" when the officers arrived at his house. SA Corey reassured Lynch that he was helping himself by speaking with the officers about the events that had happened the previous day. SA Corey left the vehicle to take several phone calls, and Det. Cummer had to assist him in getting out of the vehicle each time because of the child lock in the backseat.

Nearly one hour into the interview, Det. Cummer asked Lynch to "[j]ust let [him] know when [Lynch] want[ed] to start heading back." SA Corey also asked, "Yeah are we holding you from anything now?" Lynch responded, "No." SA Corey explained that they did not want Lynch to feel like they were holding him.

Approximately ninety minutes into the interview, Lynch asked to stop to use the restroom, and the officers followed Lynch's direction to the location of his choice: a boat launch in Elliot, Maine. Lynch got out of the car without assistance, and the officers remained in the car while Lynch used the restroom. As Lynch exited the vehicle, he joked, "I am not gunna run away I will be back," and shortly thereafter he returned.

The officers confirmed with Lynch where he wanted them to drop him off and then dropped him off down the road from his home so that he could smoke a cigarette. Lynch exited the car without assistance and departed from the vehicle.

## II. LEGAL ANALYSIS

Lynch makes several arguments in support of his motion. First, that the officers' entry onto his property in Kittery, Maine, which immediately preceded the interview, violated his Fourth Amendment rights. Second, that he was subject to custodial interrogation without being informed of his *Miranda* rights during the first twenty-two minutes of the interview. Third, that the statements that he made to the officers during the two-hour interview were made involuntarily, in violation of his Fifth Amendment protection from self-incrimination.

### A. The Entry onto Lynch's Property Did Not Violate the Fourth Amendment

Lynch argues that the officers' entry onto his property was a violation of his Fourth Amendment rights because he did not voluntarily consent. The Government responds that the officers entered the premises pursuant to an implied license and did not exceed the scope of that license because they never entered the residence.

Although the area immediately surrounding a home—the curtilage—is afforded the same Fourth Amendment protections as the residence itself, *Florida v. Jardines*, 569 U.S. 1, 6 (2013), these protections do not prevent police officers from entering the curtilage to knock on a door without a warrant, *United States v. Bain*, 874 F.3d 1, 12 (1st Cir. 2017) (quoting *Jardines*, 569 U.S. at 8) (explaining that, under *Jardines*, an implied license to enter curtilage exists and "police may take advantage of this license to 'approach a home and knock' without a warrant"). An implied license to enter property and knock on a homeowner's door exists for "[a]ll persons, whether law enforcement agents or private citizens." *United States v. Smith*, 919 F.3d 1, 10 n.6 (1st Cir. 2019) (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)). This implied license "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8.

In this case, the officers approached Lynch's residence and knocked on the door. Lynch's girlfriend answered the door and, when the officers asked her if Lynch was home, she went back into the home to get him. Lynch promptly came to the front door to speak with the officers, telling them that he believed that they were there to

talk to him about the deceased. The officers remained at the door and never entered the residence. Their entry onto Lynch's property did not exceed the scope of their implied license to approach and knock on the door. Contrary to Lynch's assertion that the officers misrepresented their purpose for asking to speak to Lynch, it was Lynch himself who acknowledged that the officers were there to discuss the death of his girlfriend's brother the previous day. As such, the officers' entry onto Lynch's property did not violate his Fourth Amendment rights.

**B.   Lynch Was Not Subject to Custodial Interrogation During the Two-Hour Interview on October 30, 2018**

Lynch argues that he was subject to custodial interrogation without being timely informed of his *Miranda* rights, in violation of his Fifth and Fourteenth Amendment rights. The Government responds that Lynch was never in custody during the interview, either before or after the officers read him his *Miranda* rights. There is no dispute that Lynch was interrogated.

*Miranda* warnings must be provided before a suspect is subjected to "custodial interrogation." *Miranda*, 384 U.S. at 444. A person is in custody upon formal arrest or when "otherwise deprived of . . . freedom of action in any significant way." *Id.* A court performing this analysis must "examine[] the circumstances surrounding the questioning and then [determine] whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest." *United States v. Guerrier*, 669 F.3d 1, 6 (1st Cir. 2011).

Specifically, courts in the First Circuit look to four factors, among others, to determine whether an individual was in custody: (1) "whether the suspect was

8

questioned in familiar or at least neutral surroundings"; (2) "the number of law enforcement officers present at the scene"; (3) "the degree of physical restraint placed upon the suspect"; and (4) "the duration and character of the interrogation." *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011) (quoting *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996)).

Lynch was not in custody when he was interviewed by SA Corey and Det. Cummer. First, although Lynch was in unfamiliar settings—an unmarked police car—for most of the interview, the circumstances surrounding that setting rendered the car a relatively neutral location. Lynch requested that the interview be conducted in private, away from his girlfriend (who was present at the home) and his parents (who were due to return to the home). The officers therefore offered the police car as the location for the interview. The police vehicle was unmarked, the officers were not in uniform, the officers never brandished their weapons, and Lynch was seated in the front alongside Det. Cummer. Because of Lynch's concerns about privacy, the vehicle was a more neutral location than his home.

Second, few law enforcement officers were present. Lynch was interviewed by only two. He was outnumbered, but not substantially so. Additionally, the officers took turns speaking with Lynch and thus did not utilize their numerical advantage to intimidate Lynch.

Third, the degree of physical restraint was minimal. Before getting into the police vehicle, Lynch went into the house by himself to get his phone and cigarettes. Once he entered the vehicle, he sat in the front seat and was therefore not locked in the car, as he would have been had he been seated in the back. He was not placed in

9

handcuffs. Approximately ninety minutes into the interview, Lynch asked to stop to use the bathroom and the officers quickly accommodated him. Lynch exited the vehicle without assistance and even joked with the officers that he would return—which he promptly did. The officers asked Lynch where he wanted to be dropped off at the conclusion of the interview and then dropped him off at the requested location so that he could smoke a cigarette and walk back to his house. This factor militates strongly against a finding that Lynch was in custody during the interview.

Finally, the duration and character of the questioning does not indicate that Lynch was in custody. The interview lasted approximately two hours and was conducted in a non-accusatory manner. Indeed, Lynch volunteered many of the incriminating statements before the officers posed the majority of their questions. The questioning was marked by multiple breaks, including the bathroom break when Lynch exited the vehicle. Perhaps most importantly, the officers told Lynch throughout the interview that he was not under arrest, that he would not be arrested that day, and that they did not want him to feel that he was being held or taken anywhere he did not want to go. Lynch was not involuntarily transported anywhere, and, as noted above, the location of the interview was determined by his desire for privacy.

Lynch's reliance on *United States v. Valentine,* 657 F. Supp. 2d 388 (W.D.N.Y. 2009), is misplaced. The defendant in *Valentine* was pulled over by a marked police car, directed to exit his vehicle, frisked, placed in the back of the police car, and transported to the police station for further questioning—a scenario in which the Western District of New York found the defendant to be subject to custodial

interrogation. *Id.* at 391-92. Those facts simply do not align with the circumstances of Lynch's interview.

I conclude that Lynch was not in custody for purposes of *Miranda* before or after the officers read him his rights.

### C. Voluntariness

Lynch argues that the government has not met its burden to show that the statements made by Lynch were voluntary. He contends that his statements to Det. Cummer and SA Lynch were involuntary because the officers waited twenty-two minutes before reading him his *Miranda* rights, took advantage of Lynch's grief over the death of his girlfriend's brother, and led Lynch to believe his statements would not be used against him.

The test for voluntariness is "whether the will of the defendant ha[s] been overborne so that the statement was not his free and voluntary act." *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986) (quoting *Procunier v. Atchley*, 400 U.S. 446, 453 (1971)). This test is to be resolved "in light of the totality of the circumstances." *Id.* (quoting *Procunier*, 400 U.S. at 453). Where a defendant claims that his confession was extracted involuntarily, the Government's burden is to show that, based on the totality of the circumstances, the investigating agents neither "broke" nor overbore his will. *Chambers v. Florida,* 309 U.S. 227, 239-40 (1940); *cf. Colorado v. Connelly,* 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.").

11

Relevant considerations to determine the voluntariness of a defendant's statements include "the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs." *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014). Other factors are also relevant, such as the defendant's "age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system." *Id.* (citation omitted).

Here, the Government has satisfied its burden to prove, by a preponderance of the evidence, that Det. Cummer and SA Corey did not break or overbear Lynch's will. As discussed above, the officers never handcuffed or arrested Lynch—instead, they repeatedly assured him that he was not under arrest. Lynch rode in the front seat of the vehicle, alongside Det. Cummer. Lynch freely left the vehicle to use the restroom, and the officers dropped him off at the location of his choice at the end of the interview. The officers were courteous and respectful in their questions. The officers told Lynch that his willingness to discuss the circumstances around the provision of drugs to the deceased person may be beneficial to him and they did not threaten him in any manner. These circumstances all support a finding of voluntariness.

Although Lynch was emotional at times throughout the interview, there is no question that he was lucid and acting voluntarily. Even if Lynch's statements were the result of an emotional response, this is not enough to consider the statements involuntary. *See Bryant v. Vose*, 785 F.2d 364, 368 (1st Cir. 1986) (holding that although the defendant's confession was likely prompted by police comments that led him to feel sorrow and remorse, the nature of the confession as an "emotional response" did not render it involuntary).

Finally, although the officers were, to a limited degree, deceptive toward Lynch as to the purpose of the encounter, the level of deception did not render Lynch's statements and actions involuntary. The First Circuit has clarified that "[l]aw enforcement officers often must fight fire with fire, and some degree of deception on their part during the questioning of a suspect is permissible." *Hughes*, 640 F.3d at 439; *see United States v. Flemmi*, 225 F.3d 78, 91 n.5 (1st Cir. 2000) (noting that, although "trickery can sink to the level of coercion, . . . this is a relatively rare phenomenon"). Law enforcement officers are constitutionally permitted to engage in manipulative behavior such as "insincere friendliness which successfully induces a criminal suspect to willingly answer questions and/or consent to a search." *United States v. Hornbecker*, 316 F.3d 40, 49 (1st Cir. 2003). In this instance, the officers' limited deception was unexceptional and fell within the bounds permitted by judicial precedent.

Based on this evidentiary record, I am satisfied that Lynch's statements and his decision to speak with Det. Cummer and SA Corey were voluntary. The high threshold for involuntariness is not met here.

### III. CONCLUSION

For the foregoing reasons, Lynch's Motion to Suppress (ECF No. 53) is **DENIED**.

**SO ORDERED.**

Dated: September 22, 2021

                                                /s/ JON D. LEVY
                                         **CHIEF U.S. DISTRICT JUDGE**